# DOE v. DOE.

No. 2817.    Decided Feb. 11, 1916.    Rehearing Denied, July 1, 1916..
(158 Pac. 781.)

1. TRIAL—FINDINGS—SUFFICIENCY.  Under the statute requiring specific and direct findings of ultimate facts, and a separate statement of conclusions of law in cases tried to the court, until there are findings on all the material issues raised by the pleadings sufficiently specific and certain to ascertain just what is found and decided without resorting to the evidence or ·pleadings, the findings are insufficient to support the judgment. (Page 203.)

2. DIVORCE—FINDINGS—ADULTERY.  Under the statute requiring specific findings of ultimate facts in cases tried to the court, in an action for divorce in which counterclaim sought separate support, a finding "that since May,' 1911, ·the plaintiff has consorted with women other than his wife," was insufficient as a finding of the ultimate fact of adultery.  (Page 203.)

3. DIVORCE—FINDINGS—SUPPORT.  A finding "that plaintiff has not failed to provide for defendant the common necessaries of life," even if sufficient, would have been more in compliance with the statute if it had stated the ultimate facts as to just what provision plaintiff had made for defendant and what support and maintenance he had rendered her.  (Page 203.)

4. DIVORCE—FINDINGS—CRUELTY.  Findings "that such plaintiff has not suffered great bodily injured or mental distress by reason of the facts alleged in his complaint or any of same," and "that plaintiff without cause and against defendant's will had willfully deserted her, though raising an inferenec against the allegations of cruelty in the complaint that defendant almost constantly nagged, harassed, annoyed and rebuked plaintiff, found fault with him with intent to injure his character and reputation, and made false accusations of sexual immorality against him to his employers, are argumentative and uncertain.  (Page 203.)

5. DIVORCE—FINDINGS—DESERTION.  A finding that plaintiff "deserted the defendant without good cause, or any cause, and ever since has and still continues to so willfully, and without any cause, desert said defendant and to live separate and apart from her without any cause or sufficient cause or reason, against her will and without her consent," would ordinarily be a sufficient finding of desertion, but is insufficient in view of plaintiff's showing of cruelty of defendant.  (Page 203.)

Appeal from Third District.

6. APPEAL AND ERROR—REVIEW—EQUITY CASES—TRIAL DE NOVO. On appeal of an equity case, the Supreme Court may try the case de novo on the record, and make or direct the findings necessary before any question of law can be considered or conclusion reached either on the law or facts. (Page 204.)

7. APPEAL AND ERROR—REVIEW—FINDINGS. While, on appeal, the Supreme Court may approve, modify, or annul findings of the trial court, yet, as the trial court has better opportunity to test the credibility of witnesses and the weight of their testimony, specific findings on material issues on conflicting evidence will generally be approved unless so clearly against the weight of the evidence as to show error. (Page 204.)

8. HUSBAND AND WIFE—SEPARATE MAINTENANCE—RIGHT OF ACTION —FAILURE TO PROVIDE. In an action for divorce in which defendant filed a counterclaim for separate maintenance and support, where it appeared that defendant had exclusive use of the house, had received $8 to $10 a month for rooms part of the time, from $20 to $25 per month for music lessons part of the time, and that plaintiff paid her, in 1911, $655, in 1912, $903, in 1913, $755, in 1914, $682, there was no failure of plaintiff to provide for defendant since May, 1911. (Page 210.)

9. HUSBAND AND WIFE—ACTIONS FOR SEPARATE MAINTENANCE—EVIDENCE—SUFFICIENCY. Evidence as to incidents occurring, one twelve and the other seven years, prior to the action, not alleged nor relied on in the counterclaim, held insufficient to support a charge on information and belief of adultery with women unknown. (Page 210.)

10. HUSBAND AND WIFE—ACTIONS FOR SEPARATE MAINTENANCE—EVIDENCE—SUFFICIENCY. In an action, evidence held insufficient to sustain defendant's charge as to plaintiff's adultery, on specific occasions relied on. (Page 210.)

11. HUSBAND AND WIFE—SEPARATE MAINTENANCE—ADULTERY—CONDONATION. If, after a husband committed adultery, he and his wife talked the matter over "like two lovers," "and everything was satisfactory and the matter settled," the offense was condoned. (Page 210.)

12. DIVORCE—GROUNDS—"CRUELTY." Where a wife, without foundation, accused her husband of numerous acts of sexual immorality, demanded that his employers discharge him, characterized him as no better than a convict, charged him with failure to support her, employed detectives to trail him, and sought his arrest on criminal charges, her acts constituted cruelty causing great mental distress. (Page 211.)

13. DIVORCE—GROUNDS—CRUELTY.  In a divorce case, what will con-
stitute cruelty causing great mental distress depends upon the
facts and circumstances of the case, with the necessity of a
somewhat aggravated case before a decree will be granted a
husband.  (Page 211.)

Appeal from District Court, Third District; *Hon. C. W.
Morse*, Judge.

Action for divorce by Charles A. Doe against Effa L. Doe,
in which defendant files a counterclaim for separate support
and maintenance.

From a judgment dismissing the complaint and awarding
separate support on the counterclaim, plaintiff appeals.

REVERSED and remanded, with directions.

*Stewart, Stewart & Alexander*, for appellant.

*H. C. Edwards* and *D. H. Thomas*, for respondent.

STRAUP, C. J.

The plaintiff brought this action for a divorce on the ground
of cruelty.  In substance, it is alleged in the complaint that
for several years prior to May, 1911, the defendant, almost
constantly, nagged, harassed, annoyed, and rebuked the plain-
tiff, found fault with him, and, with the intent to injure his
character and reputation, made false accusations against
him to his employers and others accusing him of sexual im-
morality, associating with bad women, leading a double life,
failing to provide for her, and leaving her dependent upon
the charity of friends.  All these matters as to time, place,
occasions, and circumstances are alleged with great particu-
larity.  The defendant denied the allegations of cruelty and,
by way of counterclaim for separate support and maintenance,
alleged that the plaintiff, without cause and against her con-
sent, willfully deserted her, and failed to provide for her;
and that she "is informed and believes, and on such informa-
tion and belief alleges, that the plaintiff has taken up with
divers women whose names are to this defendant unknown,

and spent his time with them and has, on divers occasions, at Salt Lake City, Utah, committed adultery with said women.''

The case was tried to the court who dismissed the complaint, and on the counterclaim found, or stated the conclusion, that the plaintiff had deserted the defendant and awarded her judgment for separate support. The plaintiff appeals. His chief contentions are that the court, on the evidence, ought to have granted him a decree for divorce on the ground of cruelty, and erred in finding, or stating the conclusion, that the plaintiff without cause deserted the defendant, and in rendering a judgment in her favor. There are no findings with respect to the issues presented by the complaint; except this:

''That said plaintiff has not suffered great bodily injury or mental distress by reason of the facts alleged in his complaint or any of the same.''

As to the issue on failure to provide the court found:

''That plaintiff has not failed to provide for defendant the common necessaries of life.''

On desertion:

''That about the month of May, 1911, said plaintiff, then and now being a resident of this state, deserted the defendant without good cause, or any cause, and ever since has and still continues to so willfully, and without any cause, desert said defendant, and to live separate and apart from her without any good cause or sufficient cause or any cause or reason and against her will and without her consent.''

On adultery:

''That since May, 1911, the plaintiff has consorted with women other than his wife.''

We have, heretofore, many times referred to the statute requiring specific and direct findings of ultimate facts on all the material issues and a separate statement of conclusions of law, and held that, until there are findings on all the material issues raised by the pleadings, the findings are insufficient to support the judgment; and that the findings should be sufficiently specific and certain to ascertain just what is found and decided, without resorting to the evidence or the pleadings. These findings are wanting in

about every particular. The finding as to adultery is nothing. Though it be assumed that the finding as to failure to provide is sufficient, yet it would have been more in compliance with the statute had the ultimate facts been found as to just what provision the plaintiff had made for the defendant, and what support and maintenance he had rendered her. In a way it may be said that, from the finding that the plaintiff did not suffer great bodily injury or mental distress by reason of the facts alleged in his complaint, and from the further finding on desertion that the plaintiff, without cause and against the defendant's will, had willfully deserted her, a finding against the allegations of the complaint is inferable or implied. But that is argumentative and uncertain. For, from the findings or conclusions which were made, it may as well be argued that the allegations of the complaint are true, but that such facts were not sufficient to cause mental distress, or to justify plaintiff's leaving the defendant and living separate and apart from her. Ordinarily, it may be said that a finding such as was made on desertion is sufficient, but, when considered with the pleadings and the evidence, is insufficient for reasons presently stated.

We thus have a case where we are required to either remand it for specific findings on all the material issues, or ourselves try it *de novo* on the record and make or direct findings, before any question of law can be considered or any conclusion reached, either on the law or facts. We no **6, 7** doubt in an equity case, as this, have power to do either. Because of that, however, proper and complete findings by the trial court are not dispensed with. Each litigant is entitled to such findings on all the material issues before judgment may properly be entered. While we, on appeal, may approve, modify, or annul them, yet when specific findings are made on material issues, respecting which the evidence is in conflict, we, because of the trial court's better opportunity to test the credibility of witnesses and the weight of their testimony, generally approve such findings; unless on the record it is shown, and we are persuaded, that the finding is so clearly against the weight of the evidence as to show error. To avoid delay, additional expense, and a probable

second appeal, and because the case has been fully presented on merits, we have concluded not merely to remand it for more specific findings, but to review it and make a final disposition of it.

The parties were married in 1892 and ever since lived in Salt Lake City. The plaintiff is a bookkeeper, and at the time of the trial and for several years prior thereto, as found by the court, was earning about $175 a month. They own a five or six room house well located in Salt Lake City, which, as found by the court, was worth $4,500, upon which there is a mortgage of about $1,600, payable in monthly installments of $22.75 each. The title is in the defendant's name; but the lot was purchased, and the house built with, the plaintiff's earnings. They have no children. The defendant is about forty-three or forty-four years of age, the plaintiff eight or ten years older. According to plaintiff's testimony the parties at no time lived together very happily, because of the defendant's constant nagging, scolding, and fault-finding which led to quarrels and dissensions; and when she, to his employers and others, began to complain and falsely accuse him of immorality, associating with lewd women, leading a double life, accusing him of adultery, and charging him with failure to support her and leaving her upon the charity of friends, her conduct became so unbearable and so distressed him that he, for about a year, occupied a separate bed in the house and in a tent in the yard, took his meals down town, and finally, when she ordered him out of the house, left in May, 1911, and thereafter roomed and boarded elsewhere.

In such respect it was shown that, among other things, she went to one of his employers and accused the plaintiff of maintaining illicit relations with a women co-employee, the cashier, and demanded that she be discharged. When the employer stated that he had not observed anything out of the way and that the conduct of the plaintiff and the woman had always been proper, she charged the employer with immorality and as being no better than the plaintiff. She went to a public restaurant and there complained to the proprietor that the plaintiff, who had been accustomed to take uncheon there, maintained illicit relations with one of the waitresses and

demanded that she be discharged; and upon the proprietor's refusal to do so, and stating that he had not observed any-thing improper, she likewise charged him with immorality. To one delivering coal at the house, or collecting a bill, and also to others, she complained that the plaintiff was immoral; that he associated with lewd women; that he led a double life; was no better than a convict; and that he did not support her. After the plaintiff left the house and lived elsewhere, the defendant employed detectives to watch and trail him. They saw him several times with a woman at picture shows or theaters, once or twice on the street with her, and several times accompanying her home. When at work at night at the office, the detectives were seen in the rear of the premises peeping and spying about. On one occasion, when the plaintiff was accompanying the woman home, one of the detectives clandestinely obtained entrance to the house to observe plaintiff's conduct with the woman. The plaintiff accompanied her to the porch and there left her. All these observations were reported to the defendant by the detectives with the usual embellished details of Sherlock Holmes sleuths. When she called the plaintiff at the office by telephone and obtained no response from him, she, when he came home in the even-ing, accused him of being out associating with other women, and frequently, on other occasions, accused him of infidelity and immorality. She visited the county attorney's office and sought, but failed, to obtain the plaintiff's arrest on criminal charges.

According to the defendant's testimony, she and her hus-band, until the year 1902, were attached and devoted to each other and had no serious quarrel or disagreement. She fur-ther testified that on a morning of a day in 1902, after the plaintiff had risen to build the fire and chore about the barn before breakfast, as was his custom, the defendant, going to the kitchen and not finding the housemaid there, opened the door of the stairway leading to the maid's room, and as de-fendant says, there found the plaintiff coming down stairs, who, in response to her inquiry where he had been, stated that he was looking for his boots or slippers in the stairway where, as he claimed, they were usually kept. The defendant

went upstairs to the maid's room and there found her in bed undressed and lying on her face moaning, and said to the defendant that "she had been a bad girl." The plaintiff denied that he had been in her room or that he ever had any improper relations with her. According to the defendant's testimony, the maid left a day or two thereafter, according to the plaintiff's, several weeks therafter. The defendant testified that she and the plaintiff had no serious quarrel over the matter, and after talking with him about it believed that nothing improper had taken place and that they thereafter lived and cohabited together quite happily. Particularly as to this the defendant testified that she and the plaintiff talked the matter over the next night; that with her consent he stayed and slept with her and that they "continued to sleep together regularly after that. After that we had quite a few girls. And I hadn't thought about this incident very much. It didn't weigh heavily on my mind, I forgave it."

The plaintiff, in the discharge of his duties as bookkeeper, was required to do night work. Occasionally the defendant accompanied him to the office and wrote letters; generally the plaintiff went alone. In 1907, the plaintiff, one evening, left the house to go to the office. Later, the defendant, at about nine o'clock, also left to go to the office, expecting to find the plaintiff there. As she approached, she observed the plaintiff and some woman on the street near the office, and saw them enter the office building. The defendant followed them in and found the office lighted but the door locked. She left and crossed the street. The window blinds of the office were raised so she could see in the office but saw no one there. She accosted a stranger and told her that her husband was across the street in a room with a woman. The stranger passed on. About an hour thereafter, she saw the plaintiff and the woman coming toward the office from another room and come out. On approaching them, she discovered that the woman was one who had been, but was not then, her house-maid; not the maid heretofore referred to. A scene followed. Both the plaintiff and the maid declared that they were not guilty of any improper relations. The maid left and went down the street; the plaintiff and defendant returning home

together where, according to the defendant's testimony, they talked the matter over for most of the night and that she offered to release the plaintiff so he, if he was under any obligation, could marry the girl; but he denied that he was under any obligation and talked of leaving or killing himself, and that upon his promise to leave the maid alone the matter there ended, and the parties continued to live and cohabit together as theretofore.  As to this the defendant testified, that:

"Mr. Doe and I slept together the night following the night of the episode when he came out of the store, when he took the woman in the store.  The night of the episode we didn't quarrel.  We talked like lovers that night.  Q.  You forgave him for the indiscretion, whatever it was?  A: Yes, sir," and that upon his explanation and her explanation "everything was all satisfactory and the matter was settled."

When she was asked if they "ever had any quarreling, did you ever suspicion him after that?" she answered, "No, sir," and that she did "not know of his conduct since he left my bed," and that the first suspicion she had after that incident of plaintiff's "integrity or infidelity was when he continuously would not come and occupy the same room with me any more."  Then she was asked and she answered:

"Q.  Up to the time of the bringing of this action, did you ever suspicion Mr. Doe as to his not being true to the marital relations: that is to say, did you ever suspicion him of having improper relations with women?  You can answer that by yes or no.  A.  I cannot answer in that way."

Whatever there may be to the occasions referred to, the defendant had no information respecting them, except what she herself saw and knew and of which she had personal knowledge as to time, place, women, and circumstances, one more than twelve years, the other seven years, prior to the commencement of this action.  Neither of them is alleged in the counterclaim as an act of adultery or misconduct, for, as is seen, the acts of adultery charged are that the defendant was informed and believed and on such information and belief alleged that the plaintiff on divers occasions committed adultery with women, "whose names are to this defendant un-

known." Nor were they found, for, as shown, the only find-
ing in such respect is:

"That since May, 1911, the plaintiff has consorted with
women other than his wife."

No finding is made that he "consorted," or had any im-
proper relations, with any woman prior thereto or otherwise
was guilty of any misconduct in such respect whatsoever.
It further was shown that the plaintiff, in 1912 and 1913,
several times went with an unmarried woman to picture shows
and theaters; was on several occasions seen on the street with
her and accompanied her home; and, as testified to by the
defendant, she found a letter in a rose bush in her yard from
the girl to the plaintiff, in which reference was made to a
box of candy sent her by him and a letter written by him to
her.

The defendant did not allege that the plaintiff had been
guilty of cruelty, nor did she testify to any acts of cruelty
except on one or two occasions, when she had called him at
the office by telephone, and, not finding him there and in-
quiring of him when he came home where he had been, he
took her to task for calling him up and bothering him; and
when she told him she had received a letter from the East
concerning some property, and that she tried to call him up
and tell him about it, he angrily said, "To hell with the let-
ter," and, when she thereafter asked him to dinner, he said
"To hell with the dinner," and that he "would not eat her
damn cooking any more." Other than that, she did not tes-
tify to any acts of cruelty, except that the plaintiff, at times,
was unsociable and noncommunicative and somewhat irritable,
which, as she testified, she attributed to overwork and office
annoyances. According to her testimony, she is yet attached
to the plaintiff and is willing and anxious that he return and
live with her. She so alleged in her counterclaim. According
to his testimony, their living together in peace is out of the
question and to further attempt it is useless.

No complaint is made that the plaintiff had not supported
the defendant prior to May, 1911. The evidence shows that
thereafter she had the exclusive use of the house, part of
the time, let out rooms and received therefor from eight to

ten dollars a month, and some of the time gave music lessons for which she received from twenty to twenty-five dollars a month. In addition to that it is shown, without dispute, that he, for the year 1911, for her support and maintenance, paid her $655, in 1912, $903, in 1913, $755, and in 1914, $682.

As to most of the material testimony given by the plaintiff in support of his allegations of the complaint, he is corroborated by other testimony. As to most of the material testimony given by the defendant in support of her counterclaim, she is uncorroborated, and as to some of the issues she wholly failed. The conclusion is readily enough 8-11 reached that the plaintiff had not failed to provide for the defendant and that her charge in such respect is groundless. We are also of the opinion that the evidence is insufficient to support the charge of adultery. The only two occasions testified to to show adultery—one in 1902, the other in 1907—were not alleged nor relied on in the counterclaim. It is familiar doctrine that it is vain to prove what is not alleged. Had such occasions been alleged and relied on, yet the plaintiff failed to sustain the burden of proof in such respect. As to the occasion in 1902, the defendant did not sustain the burden that the plaintiff was even in the maid's room, much less that he committed adultery, or had any improper relations, with her. As to the occasion in 1907, the proof shows that the plaintiff, in the nightime, for no apparent legitimate purpose, entered the office building with an unmarried woman under most suspicious circumstances; but the evidence is not sufficient to justify a finding that he committed adultery with her. The most that can be said is that the parties had the opportunity to commit the offense, but that is not enough to show the commission of it. And then, because of the immediate subsequent conduct of the defendant as to her relations with, and treatment of, the plaintiff—that they talked the matter over the same, or the next, night "like two lovers," and that "everything was satisfactory and the matter settled"—and of her testimony, that she would not say that up to the time of the bringing of the action she ever suspected that the plaintiff had not been true to his marital obligations, the claim that the plaintiff had committed

adultery in the store in 1907 is greatly weakened, and if any offense then was committed it was condoned. But, let that be as it may, that occasion was not one of the alleged "divers occasions" on which the plaintiff "committed adultery with divers women whose names are to the defendant unknown." We therefore think that the issue as to adultery ought to have been found in the plaintiff's favor.

This brings us to the allegations of the complaint. Since no findings were made as to those issues, we do not know how the trial court viewed the evidence respecting them. Yet upon the determination of those issues depends the further finding on the issue of desertion and the proper **12, 13** disposition of the case. If they are found as alleged in the complaint and as testified to by the plaintiff and his witnesses, then had the plaintiff cause for leaving the defendant and living separate and apart from her, and then was he not guilty of desertion but was entitled to a judgment for divorce, unless he was himself guilty of misconduct which influenced or induced the alleged accusations and ill treatment by the defendant. If, on the other hand, the allegations of the complaint are found against the plaintiff, then had he no cause to leave the defendant and live separate and apart from her, and hence was guilty of desertion, and the defendant entitled to the judgment prayed for—separate support and maintenance. On the record we are persuaded that the preponderance of the evidence shows that the plaintiff, for a number of years prior to 1911, was guilty of nagging and faultfinding. But each spouse must expect some of that, especially the husband, who, being the stronger, ought to take and forebear much of it with patience. But the defendant did much more. Though the proof is insufficient to show that the plaintiff committed adultery in the store in 1907, yet, because of his conduct upon that occasion, the defendant undoubtedly had just cause to complain and to severely rebuke him. But that was not the basis of her complaint and accusations, made by her three or four years thereafter. Nor did it justify her wholesale charge of immorality and adultery against the plaintiff. Upon the record we find that she, without foundation therefor, to plaintiff's employers and others, accused him of

maintaining illicit relations, not with the woman in the store in 1907, but with a woman cashier where plaintiff was employed, and demanded her discharge; accused him with similar relations with a waitress employed at a restaurant; charged him with associating with lewd women, and committing adultery with them; with leading a double life; failing to provide for her and leaving her on the charity of friends; characterized him as being no better than a convict; employed detectives to trail and watch him, and sought his arrest on criminal charges. Nor was there any foundation for her blank and wholesale charges that the plaintiff, on divers occasions, committed adultery with divers women to the defendant unknown. Her nagging, scolding, and faultfinding might well be overlooked, and whatever complaint might have been made by her of plaintiff's taking a woman and remaining with her in the store in 1907, and whatever rebuke she may have administered him because of that, might well be justified; but one spouse may not, without foundation therefor, charge the other, as did the defendant the plaintiff, in the particulars heretofore enumerated, and hope to maintain peace and happiness of the marriage relation. Such things unavoidably lead to bitter dissensions and to disruption of such relation. We thus are required to find the facts as alleged in the complaint, and that they constituted cruelty causing great mental distress. Of course, as to this, no hard and fast rule can be laid down. What may be cruelty causing great mental distress in one case may not be in another. Each case must depend upon its own facts and circumstances. The adjudged cases show that courts, on the ground of cruelty, grant the wife a decree on much less evidence than they do the husband. That rests on sound principles, for acts and conduct on the part of a husband may well constitute cruelty to the wife causing her great mental distress, when similar acts and conduct on her part may not constitute cruelty to him, or cause him great mental distress. Before a decree is granted the husband on such ground, it ought to be a somewhat aggravated case. But we, with some reluctance, have reached the conclusion that this is such a case, and therefore are we of the opinion that the plaintiff is entitled to a decree. With this it follows

that he did not without cause, but with cause, leave the defendant and live separate and apart from her.

Now, as to the disposition of the property. The parties have a house worth about $4,500. The title is in her name. It was purchased with his earnings. He, at the time of the trial and for several years prior thereto, was earning about $175 a month. The defendant, except her interest in the house, has no property. The court decreed that the defendant hold the title in trust for herself and the plaintiff; that neither shall sell nor incumber the property, and that the defendant be given the exclusive use and occupancy of it. That order is approved. The court further ordered that the plaintiff pay the monthly installments of $22.75 each until the mortgage on the house is paid. That also is approved. The court further ordered that the plaintiff pay one-half and the defendant one-half of the taxes and assessments to be levied against the property. That order is modified so as to require the plaintiff to pay all of the taxes, water rates, and needed repairs and assessments. The court further ordered that the plaintiff pay the defendant, for her further support and maintenance, sixty dollars a month. In view that the defendant has the exclusive use of the house and can derive some income from renting rooms and teaching music, we think the allowance large. That order, therefore, is modified so as to require the plaintiff to pay the defendant forty dollars a month. Let it be understood that all of these orders are continuing and subject to change or modification, on allegations and proof of changed conditions and circumstances of the parties. The order requiring the plaintiff to pay all attorney's fees and costs is also approved. So let the judgment of the court below, denying the plaintiff a divorce, be reversed, and the case remanded, with directions to the district court to make findings and enter judgment as herein indicated; the plaintiff to pay all taxable costs on appeal and in the court below.

Such is the order.

FRICK, J., and LOOFBOUROW, District Judge, concur.